460 A.2d 1075

In re APPEAL OF M.A. KRAVITZ CO., INC. From Denial of
Curative Amendment Application by the Board of
Supervisors of Wrightstown Township.

Appeal of BOARD OF SUPERVISORS OF
WRIGHTSTOWN TOWNSHIP.

Supreme Court of Pennsylvania.

Argued Jan. 25, 1983.

Decided April 25, 1983.

Reargument Denied June 15, 1983.

Terry W. Clemons, Doylestown, for appellant.

Richard P. McBride, Doylestown, for appellee.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION

ZAPPALA, Justice.

This is an appeal from a decision of the Commonwealth Court, reversing the decision of the Court of Common Pleas of Bucks County, which had affirmed the Board of Supervisors of Wrightstown Township in its finding that the Township Zoning Ordinance of 1971 was not exclusionary. The appellee, M.A. Kravitz Co., Inc., petitioned the Board on May 7, 1976 for a curative amendment to the Zoning Ordinance and approval of a proposed townhouse development on a 96 acre parcel of land which it owned. The land is located in an area zoned R–2 Residential, permitting only single-family dwellings. The basis for Kravitz's substantive challenge was the Ordinance's alleged unconstitutional exclusion of townhouses. Kravitz also made the alternative argument that even if the Ordinance did not totally exclude townhouse development, it resulted in a *de facto* exclusion because it made only token provision for such development.

The Board denied the amendment, finding that the Ordinance provided for townhouses in the area zoned R–4 Residential, permitting multi-family dwellings.[1] The Board also

---

1. The Definitions section of the Ordinance, Article 100, Section 102.3, provides the following relevant definitions:

 *Apartment* [At p. 100–6] (See Dwelling, Multi-Family)
 *Building* [At p. 100–7]
 A structure or appendage to a structure which: is permanently affixed to the land; has one or more floors or stories; and, is bounded by either lot lines or yards. A building shall not include such structures as billboards, fences, or other structures with interior surfaces not normally accessible to human use, such as gas tanks, grain elevators, coal bunkers or similar structures. A building may accommodate more than one family and have more than one dwelling unit and may be used for residential, commercial, industrial, public or semipublic purposes.
 *Dwelling* [At p. 100–11]
 A "dwelling unit" consists of one or more rooms for living purposes together with separate cooking and sanitary facilities and is accessible from the outdoors either directly or through an entrance hall shared with other dwelling units and is used or intended to be

found that, applying the factors used in *Surrick v. Zoning Hearing Board of Upper Providence Township*, 476 Pa. 182, 382 A.2d 105 (1977), the Ordinance did not amount to a *de facto* exclusion, and that the Township provided for its "fair share" of population growth.

The Court of Common Pleas of Bucks County, without taking additional evidence, affirmed the Board's decision.

The Commonwealth Court reversed and directed approval of the proposed development. *M.A. Kravitz Co., Inc. Appeal*, 53 Pa.Cmwlth. 622, 419 A.2d 227 (1980). In finding the Wrightstown Township Zoning Ordinance to be unconstitutionally exclusionary, the Commonwealth Court followed a line of its own decisions, beginning with *Camp Hill Development Co. v. Zoning Board of Adjustment, Borough of Dauphin*, 13 Pa.Cmwlth. 519, 319 A.2d 197 (1974), which "set

used by one or more persons living together and maintaining a common household.
*Single-Family Attached Dwellings (Townhouse)*
A building designed for and occupied exclusively as a residence for only one family and having a party wall on at least one side (or both sides) in common with an adjacent building.
*Single-Family Detached Dwelling*
A building designed for and occupied exclusively as residence for only one family and having no party wall in common with an adjacent building.
*Single-Family Semi-Detached Dwelling*
A building designed for and occupied exclusively as residence for only one family and having one party wall in common with an adjacent building.
*Multi-Family Dwelling*
A building designed for or occupied by three or more families.
*Garden Apartments* [At p. 100–11]
A group of multi-family dwellings, up to three stories in height, designed for rental or condominium ownership of the individual housekeeping units and having common open spaces.
Article 200 of the Ordinance creates four Residential Districts. Districts R–1 and R–2 allow only single-family detached houses and agricultural uses by right (with accessory uses and exceptions not here relevant). District R–3 allows only single-family detached houses, agricultural uses, and cluster development (of single-family detached houses) as residential uses by right. Section 204.1(A) provides:
In R–4 districts, land, buildings, or premises shall be used by right for only one or more of the following:
1. Multi-family dwelling constituting a single operating or propriety (sic) unit.

standards by which zoning ordinances can be evaluated for exclusionary provisions". *Kravitz Appeal,* 53 Pa.Cmwlth. at 625, 419 A.2d at 229 (1980). In *Camp Hill, Ellick v. Board of Supervisors, Worcester Township,* 17 Pa.Cmwlth. 404, 333 A.2d 239 (1975), and others, the Commonwealth Court dealt with ordinances which explicitly prohibited the construction of townhouses. In *Appeal of Robert P. Olson,* 19 Pa. Cmwlth. 514, 338 A.2d 748 (1975), the court dealt with an ordinance which did not prohibit townhouses, but did not provide for them either. Both circumstances were held to be controlled by this Court's decision in *Girsh Appeal,* 437 Pa. 237, 263 A.2d 395 (1970). Treating townhouses as "an accepted form of development entitled . . . to the same recognition accorded by *Girsh* to apartments", *Camp Hill,* 13 Pa.Cmwlth. at 525, 319 A.2d at 200, the Commonwealth Court developed the rule that an ordinance which prohibits or unreasonably fails to provide for townhouses is unconstitutional. In the present case, the court reviewed the Ordinance and determined that the only district which conceivably allows for more than single-family detached residential uses, "cannot be reasonably construed to incorporate the separate and distinctly provided for single-family attached townhouse use". 53 Pa.Cmwlth. at 627, 419 A.2d at 230. Concluding that the Ordinance "fails to provide a home for [the] legitimate and necessary development [of townhouses]", 53 Pa.Cmwlth. at 628, 419 A.2d at 230, the court declared the Ordinance unconstitutional and directed approval of the proposed development. We reverse.

Central to the Commonwealth Court's decision in *Camp Hill* and, consequently, in this case, is the assumption that townhouses, being a legitimate and accepted form of residential use, are entitled to the same protection afforded to apartments in *Girsh.* This assumption ignores significant facts which bore on our decision in *Girsh* and thus, while tracing the rule of that case, it outruns the reasoning which supports that rule.

In *Girsh,* the developer sought to build two nine-story buildings, each containing up to 280 luxury apartments, on a

■■■■■■■■■■■■■■■■■■■■

17.5 acre parcel of land in an area zoned for single-family dwelling units. Approximately 75% of the township's land area was zoned to permit only the construction of single-family dwellings. The remainder was zoned for commercial and industrial uses, with two apartments having been permitted by variance. Multi-unit apartments were neither expressly prohibited nor expressly provided for in the zoning ordinance.

Writing for the majority[2], Mr. Justice Roberts (now Chief Justice) began by observing that "[t]o be constitutionally sustained, [the township's] land-use restriction must be reasonable". 437 Pa. at 241, 263 A.2d at 397. He then observed that *"[a]t least for the purposes of this case,* the failure to provide for apartments anywhere within the Township must be viewed as the legal equivalent of an explicit total prohibition of apartment houses in the zoning ordinance". *Id.* (Emphasis added). Former Chief Justice Bell concurred in the opinion of the Court on the ground "that the present zoning ordinance (1) *in practical effect* amounts to a prohibition of apartment houses . . ." 437 Pa. at 247, 263 A.2d at 400 (Emphasis in original).

We think it important to note that this basic element of the reasoning in *Girsh* was explicitly limited to facts peculiar to that case. We also observe that the ordinance challenged in *Girsh* made no provision for any form of residence other than single-family units. The developer sought to build multi-unit high rise apartments, but the zoning ordinance did not permit any form of multiple dwelling. Indeed, Girsh argued that he used the term "apartments" to include all forms of multiple dwellings. (Brief of Appellant Joseph Girsh, p. 11). The importance of these observations becomes apparent in light of the rationale which supported our holding.

2. Mr. Justice Roberts wrote the Opinion of the Court, in which he was joined by Justices Eagen and O'Brien. Chief Justice Bell wrote a concurring opinion in which he concurred in the Opinion of the Court. Justice Jones filed a dissenting opinion in which Justices Cohen and Pomeroy joined.

That rationale was derived from two previous cases, *National Land and Investment Co. v. Easttown Township Board of Adjustment*, 419 Pa. 504, 215 A.2d 597 (1965), and *Exton Quarries, Inc. v. Zoning Board of Adjustment*, 425 Pa. 43, 228 A.2d 169 (1967). In *Exton Quarries* it was stated that:

The constitutionality of zoning ordinances which totally prohibit legitimate businesses . . . from an entire community should be regarded with particular circumspection; for unlike the constitutionality of most restrictions on property rights imposed by other ordinances, the constitutionality of total prohibitions of legitimate businesses cannot be premised on the fundamental reasonableness of allocating to each type of activity a particular location in the community.

425 Pa. at 59, 228 A.2d at 179.

We did not decide *Girsh* by simply applying this reasoning from *Exton Quarries* to apartments (in the restrictive sense of multi-unit high rise buildings) as a "legitimate business". Nor could we have decided it in that way, because the ordinance in *Girsh* did not enact a total prohibition on apartments, it simply did not provide for them. We also looked to *National Land* where the broader question was presented, "whether the township can stand in the way of the natural forces which send our growing population into hitherto undeveloped areas . . .", 419 Pa. at 532, 215 A.2d at 612, and answered, "[a] zoning ordinance whose primary purpose is to prevent the entrance of newcomers . . . cannot be held valid". *Id.* A fair reading of *Girsh* makes it clear that there, as in *National Land,* we were concerned with the exclusion of population growth. ["Appellee here has simply made a decision that it is content with things as they are, and that the expense or change in character that would result from people moving in to find 'a comfortable place to live' are for someone else to worry about. That decision is unacceptable". 437 Pa. at 244, 263 A.2d at 398. "Nether Providence Township may not permissibly choose to only take as many people as can live in single-family housing, in

effect freezing the population at near present levels. Obviously if every municipality took that view, population spread would be completely frustrated." *Id.*]

It cannot be ignored that one of the factors which led to our decision in *Girsh* was the township's failure to provide for any type of multiple dwelling, thereby preventing population expansion. Because the developer in *Girsh* sought to build only multi-unit high rise buildings, in the common law tradition treating only the facts in the case at hand, our holding in *Girsh* was that the township could not have "a zoning scheme that makes no reasonable provision for apartment uses". 437 Pa. at 243, 263 A.2d at 398. Among the relevant facts in the case was the fact that the township had made no provision for any type of multiple dwelling. The failure to provide for apartments, therefore, operated to exclude population growth, an impermissible result under the *National Land* rationale. It was this effect of excluding population growth which gave the ordinance the character of an explicit prohibition subject to the *Exton Quarries* rationale. In *Girsh* we were not faced with, and therefore did not address, the issue whether the failure to provide for apartments in an area where other types of multiple dwellings were available, which presumably would not have the effect of excluding population growth, would also be equated with an explicit prohibition and fall under the *Exton Quarries* rationale.

In *Camp Hill, Ellick,* and *Olson,* the Commonwealth Court interpreted *Girsh* by focusing on apartments as a legitimate residential use. In doing so they ignored the factual element of *Girsh* which made the failure to provide for such uses unreasonable, *i.e.,* the exclusion of population growth. We once again observe that "to be constitutionally sustained, [the township's] land-use restriction must be reasonable". *Girsh,* 437 Pa. at 241, 263 A.2d at 397. By ruling that any failure to provide for any particular residential use under any circumstances is unconstitutional, the Commonwealth Court has assumed the element of unreasonableness.

In *Surrick v. Zoning Hearing Board of Upper Providence Township*, 476 Pa. 182, 382 A.2d 105 (1977), we had occasion to review the decisions of this Court in exclusionary zoning cases to synthesize a "useful analytical method" of applying "the relevant factors to which a court must look in conducting a review of zoning ordinances which are alleged to be exlusionary". 476 Pa. at 191–2, 382 A.2d at 110. We there characterized *Girsh* along with *National Land* as being in a line of decisions "which had invalidated zoning techniques which seriously impeded or effectively 'zoned out' *population growth* ". 476 Pa. at 188, 382 A.2d at 108 (Emphasis added). We thereby implied that in residential use cases the analysis had not entirely been turned over to the *Exton Quarries* rationale, but was still tied to the concept of providing for population growth. We also characterized *Girsh* as invalidating the "exclusion of *multi-family dwellings* ", 476 Pa. at 189, 382 A.2d at 108 (Emphasis added), which invalidation was extended to partial exclusion, or 'selective admission' of multi-family dwellings in *Township of Willistown v. Chesterdale Farms, Inc.,* 462 Pa. 445, 341 A.2d 466 (1975). By characterizing these cases, which had only concerned apartments, as dealing with the exclusion of *multi-family dwellings,* we implicitly acknowledged the primary position which the population issue occupied, subordinating the question of particular uses.

The analytical method developed in *Surrick* for reviewing zoning ordinances alleged to be exclusionary begins with the question whether the community is a "logical area for development and population growth", considering its proximity to a large metropolis and projected population growth figures for the community and the region. 476 Pa. at 192, 382 A.2d at 110. If the answer to this inquiry reveals that the community is in the path of urban-suburban growth, "the present level of development within the particular community must be examined", *Id.,* by considering population density data, the percentage of land undeveloped, and the percentage of land available for the development of *multi-family dwellings. Id.*

■ At this point in the analysis in *Surrick,* we paused to acknowledge a shift in the focus of the next relevant inquiry. Whereas the earlier cases had determined whether there was evidence of a "primary purpose" or exclusionary intent to zone out population growth, the more recent cases had made it clear that "[o]ur primary concern now is centered upon an ordinance's exclusionary impact", 476 Pa. at 193, 382 A.2d at 110–11, its "*actual effect* . . . upon the availability of multi-family dwellings". *Id.* (Emphasis in original). It is clear, however, that the examination of the ordinance's effect is not to be conducted in a vacuum; it must first be determined that the community is a logical area for development and growth and that it is not already highly developed. By directing its attention initially to whether the effect of the ordinance is a total or partial exclusion, the Commonwealth Court has short circuited the analysis, bypassing these elements which go to the reasonableness of the township's exercise of its zoning power.

■ The final step in the "analytical matrix" described in *Surrick,* analyzing the effect of the ordinance, must involve a consideration of the extent of the exclusion. "Is there a *total* exclusion of multi-family dwellings, which we disapproved in *Girsh Appeal, supra,* or is the exclusion *partial?* If the zoning exclusion is partial, obviously the question of the ordinance's validity is more difficult to answer." 476 Pa. at 194, 382 A.2d at 111. Determining the effect of a partial exclusion must be accomplished by examining the percentage of land available for multi-family dwellings considered in light of community and regional population growth pressures, and in light of the amount of undeveloped land available. We note that this inquiry is phrased in terms of excluding multi-family dwellings, and in terms of the ordinance's effect on population expansion and the availability of multi-family dwellings generally, rather than on the exclusion of, or effect on, any particular design type of multi-family dwelling.

Whether a community could permissibly *prohibit* a given use (in the sense of a particular architectural design) is a

question which is not presented by this case. We suspect that the *Exton Quarries* rationale standing alone might control that question. The question which this case presents is whether a community must affirmatively provide for a particular architectural design in its plan for development. In no case has this Court held that a municipality's zoning ordinance must affirmatively provide for *any* specific use— residential, commercial, industrial, or otherwise. Our holdings have been limited to statements that an ordinance may not prohibit certain uses, because total prohibitions "cannot be premised on the fundamental reasonableness of allocating to each type of activity a particular location in the community". *Exton Quarries,* 425 Pa. at 59, 228 A.2d at 179. As applied to residences, we have found ordinances which fail to provide for a particular use unreasonable where they exclude population growth generally. *Girsh Appeal.* We have never found an ordinance unreasonable solely because it fails to provide for a particular use. We will not do so here.

 In considering a zoning appeal, where the court of common pleas takes no additional evidence, the appellate courts are limited to a determination of whether the board committed an abuse of discretion or error of law. *National Land v. Easttown Township,* 419 Pa. at 523, 215 A.2d at 607. The court may not disturb the findings of the board if the record indicates the findings are supported by substantial evidence. 53 P.S. § 11010. We have concluded that the Commonwealth Court failed to apply the standards developed by this Court for reviewing zoning ordinances alleged to be exclusionary. Because this Court may just as readily review the record for an abuse of discretion, no useful purpose would be served by remanding this case to the Commonwealth Court for that purpose. We therefore undertake our own review of the record to determine whether the Wrightstown Township Board of Supervisors abused its discretion or committed an error of law in finding the Zoning Ordinance not exclusionary, and whether the Court of Common Pleas of Bucks County properly applied this

Court's exclusionary zoning cases in reviewing the Board's findings.

We first note that the Board found that, although no separate townhouse district was established by the Zoning Ordinance, "the intention of the drafters was to permit townhouse development as well as other multi-family dwellings to be located in the R–4 District". (Findings of Fact, ¶ 11, p. 3; ¶ 36, p. 9). This finding was supported by the testimony of Jack M. Kendree, president of the company which prepared the Comprehensive Plan and the Zoning Ordinance for Wrightstown Township. In the opinion of Mr. Kendree, townhouses "could be considered as a permitted housing type under the multi-family district" of the Ordinance. (Hearing of September 28, 1977, p. 3). Townhouses were considered a type of multi-family residential use and were intended to be one of those types of variety of housing permissible in the R–4 zoning area. (*Id.* at p. 5). Kendree's company "recommended to the Planning Commission in the Comprehensive Plan discussions and in subsequent adoption of the plan and Zoning Ordinance that . . . , since the Township was single-family at the time, that the higher density residential types be clarified (sic) as multi-family". (*Id.* at p. 10). Referring to the separate definitions given for single-family attached dwelling (townhouse) and multi-family dwelling, Kendree testified that the Ordinance "is not intended to distinguish between them. . . . Single-family dwellings (townhouse) could be encompassed under a definition of multi-family dwelling". (*Id.* at p. 13).

The Commonwealth Court made no specific reference to the standard of review which it applied. From its statement that "the R–4 district, in allowing only multi-family dwelling development, cannot reasonably be construed to incorporate the separate and distinctly provided for single-family attached townhouse use", we may assume that the court concluded the Board abused its discretion or committed an error of law in finding to the contrary. Although the Ordinance is unclear, a fact which the Board acknowledged (Findings of Fact, ¶ 36, p. 9), we cannot agree with the

Commonwealth Court that the interpretation given by the Board to its own Ordinance is unreasonable, especially in view of the testimony of the president of the planning firm responsible for drafting the Ordinance. Whether this Court, or the Commonwealth Court, would interpret the Ordinance differently, the Board had substantial evidence on which to base its finding that the Ordinance did not exclude townhouses. The Commonwealth Court exceeded the proper scope of its review in giving the Ordinance its own interpretation.

The record reveals that Wrightstown Township is approximately 37 miles from Philadelphia and 18 miles from Trenton, and that no major highways link the Township with these communities. No major employers are presently located within the Township, nor in any of the immediately surrounding townships. The major employment centers other than Philadelphia and Trenton are Doylestown, approximately 10 miles to the northwest; Lower Bucks County, approximately 12 miles to the south; and Montgomery County, about 15 miles to the southwest. Wrightstown is not serviced by any form of mass transportation, rural bus, or commuter transit to any of these employment centers. (Findings of Fact, ¶¶ 29–33, p. 8; see also, Opinion of the Court of Common Pleas at p. 5).

At the time the Ordinance was adopted, the Bucks County Planning Commission, using Wrightstown's 1970 population of 2,266 as a base, projected the Township's population at 2,600 in 1975; 3,004 in 1980; 3,820 in 1985; and 4,900 in 1990. (The Delaware Valley Regional Planning Commission estimates more conservative population growth—increases of only 131 persons to 2,395 through 1980; 60 persons to 2,455 through 1985; and 65 persons to 2,515 through 1990.) The Bucks County estimates for Wrightstown, expressed as percentage increases, mirror the projected population growth for the county as a whole through 1980, the Township projected to grow at more than double the county rate in the years beyond.

The Board also accepted the testimony of Dr. Robert H. Edelstein, Professor of Finance at the Wharton School of the University of Pennsylvania. His testimony concerned a market study which he conducted of the Philadelphia area generally, and Wrightstown in particular, to determine the need for additional housing during the ten years between 1976 and 1986. Among his findings were a national trend toward movement away from the large urban centers of the northeast toward the "sun-belt" areas of the country—Florida, California, Arizona; that the Philadelphia area will not experience a net population growth; and that the Wrightstown area has experienced little growth in the past and is designated as an area slated for little growth in the future. (*See generally,* Hearing of April 19, 1977).

■ Based on this and other evidence, the Board properly determined that the Township is not a logical place for rapid growth and development, although some population expansion may be anticipated.

Kravitz argues that the 40 acres zoned for multi-family housing out of a total Township area of 6,491 acres, approximately 0.6%, is patently only a token provision for multi-family housing. The percentage of land available for multi-family needs is not to be considered in isolation, however. *See Surrick,* 476 Pa. at 194, 382 A.2d at 111. Given the projected population figures for the township and the region, and more importantly the projected housing needs, it is apparent that Wrightstown in its 1971 Zoning Ordinance more than provided for anticipated population growth. We note that according to the Bucks County Housing Plan, the total number of new dwelling units *of all types* projected to be needed in the Township by 1985 was projected in 1974 at 259 units. (Bucks County Housing Plan, p. 57). The R-4 multi-family district alone would permit construction of 320 dwelling units, more than the total number projected for the Township. (Findings of Fact, ¶ 19, p. 5).

■ In addition to the foregoing, we note that the Board also made findings regarding the inadequacy of local roads

and the absence of mass transportation in the Township. It is clear that the Township may not avoid its responsibilities to provide for its fair share of population growth by failing to provide necessary increases in municipal services which accompany such growth. *National Land; Girsh.* It is also clear, however, that not all such services are entirely within the Township's ability to provide. Major highways, for example, are typically county or state projects, and mass transportation is now primarily a regional undertaking. Wrightstown has indicated no reluctance to provide those community services, such as local road improvements, schools, etc., which are its responsibility.

One particular element of municipal services which received much attention was the provision of sewer services. The Board found that the Township is not currently serviced by public sewer. (Findings of Fact, ¶ 51, p. 14). Unlike the arguments which this Court dismissed in *National Land* and *Girsh,* the Township does not argue here that the lack of sewering justifies any failure to provide for more people. The Township has, in fact, developed tentative plans for sewering the area in several phases, in conjunction with the Bucks County Master Plan for Sewering. (Comprehensive Plan, Part II, Section III, pp. 21–22). The appellee's tract is not within the area designated for sewering in the near future. The Township has, however, consulted with local, regional, and state officials in preparing its plan, and in zoning the Township accordingly, and we find no basis for concluding that they have abused their discretion in doing so.

This Court has repeatedly eschewed the role of "super-board of adjustment" or "planning commission of last resort". We have anticipated "that zoning boards and governing bodies in the exercise of their special expertise in zoning matters, will develop and consider any number of factors relevant to the need for and distribution of local and regional housing". *Surrick,* 476 Pa. at 194 n. 12, 382 A.2d at 111, n. 12. We acknowledge that the appellee here presented to the Board testimony of experts and other evidence that popula-

tion would be expanding rapidly into the Wrightstown area creating a great demand for townhouses and other varieties of multi-family housing; and that the proposed development could be achieved without any adverse effect on traffic, sewage, or other municipal concerns. On the whole we must conclude, however, that in relying on the authorities which it accepted, rather than on those offered by Kravitz, the Board gave "a balanced and weighted consideration to the many factors which bear upon local and regional housing needs and development". *Surrick,* 476 Pa. at 191, 382 A.2d at 110.

For the foregoing reasons, the Order of the Commonwealth Court is reversed, and the Order of the Common Pleas Court is reinstated.

FLAHERTY, J., concurred in the result.

NIX, J., filed a dissenting opinion in which LARSEN, J., joined.

HUTCHINSON, J., filed a dissenting opinion.

NIX, Justice, dissenting.

I dissent. I would affirm the order of the Commonwealth Court for the reasons set forth in its well analyzed opinion. *See In Re: Appeal of M.A. Kravitz Co., Inc.,* 53 Pa. Commonwealth Ct. 622, 419 A.2d 227 (1980). The relaxed judicial review of suburban zoning decisions reflected in the plurality's view permits virtually unlimited freedom to developing municipalities to erect exclusionary walls on their boundaries, according to local whim, and to use the zoning power for aims far beyond its legitimate purposes.

LARSEN, J., joins in this dissenting opinion.

HUTCHINSON, Justice, dissenting.

No matter what the intent of its draftsmen, the plain language of the Wrightstown Township Zoning Ordinance effectively excludes townhouses, a legitimate residential use which persons of modest means demand to satisfy their right to own a home. Because this practical exclusion of a large

class of people from home ownership is not cured by other provisions in the ordinance providing for tenancies in garden apartments or other multi-family dwellings, I believe the ordinance is unconstitutional. I therefore dissent.

It is clear that the only zone in this township in which townhouses are arguably allowed is the R–4 Zone. With respect to permitted use in the R–4 Zone, the language of Section 204.1(A) of this ordinance is succinct and explicit: "In R–4 districts land, buildings, or premises shall be used by right for only one or more of the following: Multi-family dwelling constituting a single operating or propriety (sic) unit." The definition of a multi-family dwelling in Section 102.3 is equally clear: "A building designed for or occupied by three or more families." A "townhouse" is defined in Section 102.3 is "a building designed for and occupied exclusively as a residence for one family and having a party wall . . . in common with an adjacent building." Thus, the housing category "townhouse" and the housing category "multi-family dwelling" are mutually exclusive.

Relying on the testimony of experts the majority affirms the Zoning Hearing Board's conclusion that "the intention of the drafters was to permit townhouse development as well as other multi-family dwellings in the R–4 district." *See* Maj.Op. 501 Pa. at p. 212, 460 A.2d at p. 1081.[1] Since townhouses are not included in the definition of "multi-family dwellings" they are nowhere allowed in Wrightstown

1. The Township's expert testimony interpreting its zoning ordinance falls under two types: (1) testimony with respect to the intentions of the Township at the time the ordinance was adopted; and (2) expert testimony comparing townhouses to apartments. Based on that testimony, the Zoning Hearing Board found that the ordinance permitted "townhouses" in the R–4 zone.

Common Pleas did not consider whether such testimony constituted substantial evidence to support the Board's finding. Rather it held that the express language of the Ordinance permitted townhouses in the R–4 zone. Common Pleas mistakenly relied on *Benham v. Board of Supervisors of Middletown, Twp.,* 22 Pa. Commonwealth Ct. 245, 349 A.2d 484 (1975). However, in *Benham* the Township had permitted townhouses in a Planned Residential Development Ordinance. Moreover, the definitions of multi-family dwelling in the Middletown Township ordinance did not preclude townhouses as the Wrightstown Township ordinance does.

Township under this ordinance and expert testimony cannot vary this plain meaning. Legislative intent is expressed in the words of a command, not in the mind of its draftsman. Thus, if the words of a statute or ordinance are clear, its letter will not be disregarded under the pretext of pursuing an unstated legislative intent. 1 Pa. C.S. § 1921(b) (Supp. 1982–83); *In re Estate of Fox,* 494 Pa. 584, 431 A.2d 1008 (1981); *In re Lawrence Township School District,* 362 Pa. 377, 67 A.2d 372 (1949). *See also City of Pittsburgh v. Royston Service, Inc.,* 37 Pa. Commonwealth Ct. 394, 390 A.2d 896 (1978).

Thus, the Commonwealth Court correctly concluded:

The question is ... whether the R–4 multi-family district contemplates single-family attached townhouse developments specified by the zoning ordinance. We answer in the negative. The draftsmen of the ordinance had the foresight to provide for single-family attached dwellings by specifically referring to townhouse development, and multi-family dwellings, defining them as apartments and garden apartments. However, the R–4 district, in allowing only multi-family dwelling development, cannot be reasonably construed to incorporate the separate and distinctly provided for single-family attached townhouse use.... We find no imprecision in the Township's specific allowance for residential townhouse use, and can only conclude that the Ordinance fails to provide a home for its legitimate and necessary development.

53 Pa. Commonwealth Ct. 622, 627–28, 419 A.2d 227, 230 (1980).

This ordinance precludes a developer from building and marketing townhouses as the single family dwellings for which they are adapted. It is, therefore, necessary to determine whether the Township's failure to make any provision for that use is exclusionary. A party attacking a zoning ordinance as exclusionary will not succeed by showing only that certain types of architecture are proscribed if the use to which that style is adaptable is not excluded. *See* Anderson, *Law of Zoning In Pennsylvania* § 7.08 (1982). Conversely, it

should not be enough to show a particular architectural style is allowed, if the use to which it is adapted is proscribed. However, when we focus on a particular form of residential development it is difficult to neatly categorize that form as either a distinct use or an architectural style. To date, this Court has distinguished only between multi and single family use, finding each to be a distinct residential use. *See e.g. Surrick v. Zoning Hearing Board of Upper Providence Twp.,* 476 Pa. 182, 382 A.2d 105 (1977); *Girsh Appeal,* 437 Pa. 237, 263 A.2d 395 (1970) (plurality opinion); *Township of Willistown v. Chesterdale Farms,* 462 Pa. 445, 341 A.2d 466 (1975) (plurality opinion).

In some instances, townhouse construction has been used for multi-family rental use. Frequently, however, townhouse construction serves to provide families of moderate means with the opportunity to own or rent economical dwellings which preserve some of the benefits of privacy, ease of access and open space normally associated with single family dwellings. *See* Annot., 99 A.L.R.2d 873 (1965). Descendants of the old Philadelphia rowhouses, townhouses provide single family residences for prospective home owners of moderate means. The longitudinal orientation or "row" design makes private yards practical. Moreover, townhouses do not require common interior areas, i.e. hallways, stairways and elevators with their accompanying loss of privacy and difficulty in apportioning maintenance cost and responsibility. The townhouse also has an economic advantage over detached dwellings because of shared wall construction. It is a realistic alternative for moderate income persons who want to own a single family dwelling rather than rent apartment units.[2] *See* Ryan, Pennsylvania Zoning Law and Practice § 3.5.9 (Revised January 1, 1979). Thus, following *Girsh Appeal,* Commonwealth Court correct-

---

2. The Wrightstown Township Zoning Hearing Board found that families earning up to $15,000 a year are primarily restricted to apartments and townhouses with some limited access to detached dwellings. It also found that in the next ten years no housing will be built for less than $40,000.00 and people making less than $13,000 to $15,000 will not be able to afford to purchase home.

ly held in *Camp Hill Development Co. v. Board of Adjustment, B. of Dauph.*, 13 Pa. Commonwealth Ct. 519, 319 A.2d 197 (1974) that townhouses as a legitimate means of meeting a particular demand, cannot be excluded from suburban housing. *See also Dublin Properties v. Upper Dublin Twp.*, 21 Pa. Commonwealth Ct. 54, 342 A.2d 821 (1975); *Appeal of Olson*, 19 Pa. Commonwealth Ct. 514, 338 A.2d 748 (1975). As Commonwealth Court said in *Appeal of Olson:*

> We do not believe, however, that it is necessary for a municipality to provide for every conceivable type or style of residential use in its zoning ordinance. If the landowner challenges a zoning ordinance because it does not provide for some exotic style, which is not a recognized and needed style or which may be deemed to be within another residential classification already provided for in the zoning ordinance, such a challenge would be defeated. But, as we review the law established in this Commonwealth, townhouses (which are nothing more than row houses in a more modern design) are a reasonable, legitimate and recognized residential usage and a municipality must provide for such usage unless the municipality is able to sustain the burden of proving that the failure to so provide is related to the public health, welfare and safety.

*Id.*, 19 Pa.Cmwlth. at 520, 338 A.2d at 751.

Moreover, the defect in the Wrightstown ordinance is not curable by amendment to permit townhouses in the R–4 district. Because of the ordinance's restriction against individual ownership of dwelling units in the R–4 zone, moderate income families would still be effectively precluded from a practical alternative to ownership of detached dwellings.

I disagree with the statement of the majority that the *Girsh* holding is restricted to that case's facts. The rationale for *Girsh* first appears in *Exton Quarries v. Zoning Hearing Board*, 425 Pa. 43, 228 A.2d 169 (1967) (plurality opinion, Roberts, J.). Therein this Court held that "a zoning ordinance which totally excludes a particular business from an entire municipality must bear a more substantial relationship to the public health, safety, morals and general welfare

than an ordinance which merely confines that business to a certain area in the municipality." *Id.,* 425 Pa. at 60, 228 A.2d at 179.

Furthermore, in *Beaver Gas. Co. v. Osborne Borough,* 445 Pa. 571, 577, 285 A.2d 501, 504–05 (1971) we said:

In situations involving the total prohibition of otherwise legitimate land uses, which, by common experience, appear to be ... innocuous ... the applicant has met his burden of overcoming the presumption of constitutionality by showing the total ban. Thereafter, if the municipality is to sustain the validity of the ban, it must present evidence to establish the public purpose served by the regulation. It is not inconceivable, of course, that the municipality could establish the validity of a total ban but it is its responsibility to do so. In the instant case, the municipality offered no evidence to establish the validity of the regulation and has, consequently, failed to show that the regulation bears a relationship to the public health, safety, morals and general welfare.

There is no evidence here to show a public purpose sufficient to justify the total exclusion of townhouses. *See Ryan, supra* at § 3.5.9.

Where a municipality totally excludes a recognized residential use two distinct interests are foreclosed: (1) the rights of property owners to be free from "an unreasonable intermeddling with the private ownership of property". *Exton Quarries, supra;* and (2) the interest of our growing population looking "to hitherto undeveloped areas in search of a comfortable place to live." *Girsh Appeal, supra. See also Concord Township Appeal,* 439 Pa. 466, 470 n. 2, 268 A.2d 765, 766 n. 2 (1970) (plurality opinion) (quoting Sager, Tight Little Islands: Exclusionary Zoning Equal Protection and the Indigent, 21 Stan L.Rev. 767, 791 (1969); Annot., 48 A.L.R.3d 1210, 1218–22 (1973)). Such total exclusion of otherwise legitimate uses cannot be justified by concluding the Township is not in the path of development under the "fair share" test announced by a plurality of this Court in *Willistown* and a bare majority in *Surrick v. Zoning Hearing*

*Board, supra.* The simple fact that someone is anxious to build townhouses in this Township is a strong indication that people desire them. We do not believe Wrightstown Township can close its doors to these people. *See Girsh Appeal,* 437 Pa. at 245, 263 A.2d at 399. Indeed, the determination of what is a "fair share" and what communities are "in the path of development" will inevitably entangle this Court in problems of regional or community land use planning, problems unsuitable to judicial determination.

While exclusions of particular uses may bear some relationship to the ends of modern land use planning, I do not believe that the more remote suburbs on the periphery of primary growth areas may effectively close their doors to moderate and low income persons who desire to own homes in such communities. The threshold argument of the "fair share" test, that the municipality is in the path of development, implies that a community may exclude townhouses if it is not in the path of development, implies that a community may exclude townhouses if it is not in the path of development even though the exclusion lacks the requisite substantial relationship to health, safety or general morals of the community. *See Surrick v. Zoning Hearing Board, supra; Girsh Appeal, supra; National Land and Investment Co. v. Kohn,* 419 Pa. 504, 215 A.2d 597 (1965); *Glorioso Appeal,* 413 Pa. 194, 196 A.2d 668 (1964). *See also Hopewell Township Board of Supervisors v. Golla,* 499 Pa. 246, 452 A.2d 1337 (1982) (plurality opinion) (collecting cases). A citizen's right to the enjoyment of private property under Article I, Section I of the Pennsylvania Constitution and the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, as well as the concomitant rights of newcomers to seek affordable housing, preclude such unreasonable governmental interference.

The purposes of zoning were summarized by the legislature in Section 105 of the Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended* 53 P.S. § 10105.

It is the intent, purpose and scope of this act to protect and promote safety, health and morals; to accomplish a

coordinated development of municipalities, other than cities of the first and second class; to provide for the general welfare by guiding and protecting amenity, convenience, future governmental, economic, practical, and social and cultural facilities, development and growth, as well as the improvement of governmental processes and functions; to guide uses of land and structures, type and location of streets, public grounds and other facilities; and to permit municipalities, other than cities of the first and second class, to minimize such problems as may presently exist or which may be foreseen.

I do not believe that Wrightstown Township's exclusion of townhouses bears a substantial relationship to these purposes. Therefore, I dissent.