639 A.2d 1325

Henry S. BELBER, II, Bernard Drudding, III, O.J. Fuchs, Jr., W. Todd Pohlig and Sherman R. Reed, Jr. and the Isaac J. Wistar Institution,

v.

LOWER MERION TOWNSHIP.

Appeal of Henry S. BELBER, II, Bernard Drudding, III, O.J. Fuchs, Jr., W. Todd Pohlig and Sherman R. Reed, Jr., Appellants.

Commonwealth Court of Pennsylvania.

Argued Feb. 3, 1994.

Decided March 31, 1994.

Parker H. Wilson, for appellants.

Gilbert P. High, Jr., for appellee, Lower Merion Tp.

Before CRAIG, President Judge, and NEWMAN, J., and LORD, Senior Judge.

LORD, Senior Judge.

This is an appeal by Henry Belber II, Bernard Drudding III, O.J. Fuchs, Jr., W. Todd Pohlig and Sherman Reed, Jr. (builders) and the Isaac J. Wistar Institution (Institution) from an order of the Court of Common Pleas of Montgomery County affirming a decision of the Lower Merion Township Board of Commissioners (Board) denying appellants' application for tentative sketch plan approval.

## The Facts

The subject property for which a sketch plan was submitted consists of a total tract of approximately 33.6 acres, which is known as the estate named "After All" and is located at 1801

West Montgomery Avenue, Villanova, Lower Merion Township, Montgomery County, Pennsylvania.

The property was owned by Jadwiga Edwards who died in April 1988 and left the disposition of the property to the fiduciaries of her estate in trust, in accordance with certain guidelines set forth therein.

In accordance with the terms of the trust, the fiduciaries selected Wistar Institute as the recipient of After All. The Wistar Institute then formed the Institution. The fiduciaries entered into an agreement of sale with the Institution on May 16, 1990.[1]

In June 1990, the Institution entered into a written agreement with the individual applicants, Belber, Drudding, Fuchs, Pohlig and Reed, wherein the builders agreed to buy, subject to certain conditions, two portions of the property, leaving the middle portion in the possession and control of the Institution.

On or about August 31, 1990, there was submitted for approval to the Township a "Tentative Sketch Plan" (sketch plan) application proposing the subdivision of the property into twenty-five lots. Initially, the property was divided into three parts, namely, Parcel A (approximately 13.7 acres); Parcel B (approximately 10.7 acres); and Parcel C (approximately 9.2 acres). Parcels A and C were proposed for further subdivision for single family residential dwellings into fifteen lots and nine lots respectively.

The application was accepted for filing by the township's Director of Planning and thereafter the application proceeded through all the procedural steps for sketch plans required by the township's subdivision and land development ordinance (township code). On November 21, 1990, the Board denied the application.

On November 26, 1990, the township issued a letter to the applicants setting forth the Board's reasons for denial, the relevant portions of which are set out below. The Court of

1. We shall address this matter later in our discussion of standing.

Common Pleas of Montgomery County affirmed the Board's decision.

## The Standard of Review

■ When no additional testimony is taken by the Court of Common Pleas, the Commonwealth Court must determine whether the Board committed an abuse of discretion or error of law. *Appeal of M.A. Kravitz Co., Inc.*, 501 Pa. 200, 460 A.2d 1075 (1983).

## Introduction

Before the court for decision is this interesting zoning case. Unfortunately, the record reflects that the zeal exercised on both sides of the controversy created such strong emotions that meaningful discussion of compromise was apparently reduced to a minimum.[2]

■ The case is also complicated by the fact that the township has adopted a three-step process for subdivision approval—a sketch plan, a preliminary plan and then a final plan.[3] In addition, the sketch plan in this case was not

2. We cite from the record one example from each side.

   Minutes of the hearing of November 14, 1990 reveal "President Ward stated that he felt this plan was the worst example of greed he had ever seen." (Hearing minutes, November 14, 1990, p. 7).

   Mr. Wilson, the builders' counsel at that same hearing, felt that the township did not want to develop the site. When it was suggested he come back with a better design, he replied that he had come to the meeting "to make his record." (Hearing minutes, November 14, 1990, p. 8).

3. Although Article V of the Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10501–10515.3, contemplates a single-step preliminary plan approval process, *see Abel v. Township of Middletown*, 7 Pa. Commonwealth Ct. 6, 297 A.2d 525 (1972), municipalities may require a two-step preliminary approval process, and submission at the first stage may then be subject to the deemed approval provisions of MPC section 508(3). *Mid–County Manor, Inc. v. Haverford Township*, 22 Pa. Commonwealth Ct. 149, 348 A.2d 472 (1975). However, when submission of a sketch plan as a first step represents only an optional consultation stage, relief under the deemed approval section is not available. *Raccoon Mountain, Inc. v. Perry County Planning Commission*, 50 Pa. Commonwealth Ct. 613, 413 A.2d 1170 (1980).

optional, but required.[4]   Thus, some of the builders' arguments center not on whether the Board incorrectly determined that certain requirements were necessary but whether those requirements were necessary at the *sketch plan stage* of the subdivision application.

The builders also contend that the township's motive in rejecting the tentative sketch plan was to force the builders to adopt a "cluster plan" development.   We were advised that some cluster plan developments became compulsory after the sketch plan was filed by virtue of an amendment to the zoning ordinance.

There were before the trial court for resolution the following grounds of denial by the Board:

1. Lack of standing;  and failure to comply with the following sections of the township code—

2. Impervious surface cover (1)—code section 101–5.A(2);

3. Woodlands—code section 101–5.B(1)(b);

4. Conservation—code section 101–14.A;

5. Impervious surface cover (2)—code section 135–5.A(2);

6. Lot proportions—code section 135–35.A;

7. Historic sites—code section 135–24.D;  and

8. Use of the portion of the parcel retained by the Institute—code section 135–17.C(12).

The trial court in its opinion upheld the position of the builders with reference to grounds six, seven and eight and the township has now in its brief conceded that the fifth ground is not valid at the sketch plan application stage.   Thus, remaining for this court's consideration are grounds one, two, three and four.

4.   Township code Article III, Section 135–7.A provides that tentative sketch plans are required when the proposed development consists, as here, of eight or more dwelling units or five (5) or more acres.   Where tentative sketch plans are required, code section 135–7.C(3) makes them subject to the deemed approval provision of the code itself, which provision mirrors that of MPC section 508(3).

## Standing

■ We quote the Board's denial of the sketch plan based on lack of standing:

> The applicant has not demonstrated their standing to submit the application for review. The Tentative Sketch application was signed by Frederick Fuchs, P.E., agent for the Wistar Institute noted on this application as the equitable owner of 1801 Montgomery Avenue. The property reverts to the Isaac Wistar Institution after they receive a special exception to use part of the property for charitable purposes. The special exception has not been obtained, so standing has not been demonstrated.

However, on November 14, 1990, before the sketch plan application was disapproved, counsel for the Institution submitted the following to the township's Planning Commission:

> As you know, our office represents The Isaac J. Wistar Institution in connection with its interest in the 33.5–acre property known as After All, located at 1801 Montgomery Avenue in Lower Merion Township. The purpose of this letter is to demonstrate the standing of The Isaac J. Wistar Institution, a Pennsylvania non-profit corporation, to pursue approval of the subdivision of After All in Tentative Sketch No. 3222.

> By way of background, after the death of Jadwiga Edwards in April 1988, the Fiduciaries of her Estate and Trust, after a careful search, in May 1989, selected The Wistar Institute as the recipient of After All. The Wistar Institute subsequently created the Isaac J. Wistar Institution as a subsidiary entity which would develop After All and operate the facility to be located on a portion of After All.

> On July 7, 1989, The Wistar Institute filed with the Zoning Hearing Board an application for a special exception to use acreage in the center of After All for a private educational institution and philanthropic use, intending at a later date to file a subdivision plan creating two separate groups of residential building lots, one group to be accessed from Montgomery Avenue and the other group to be accessed

from Old Gulph Road. The Wistar Institute's proposed use of the core of After All and sale of the remaining portion is specifically authorized by paragraph Twenty–Third of the Edwards Trust.

It was subsequent to the filing of the special exception application that The Wistar Institute formed The Isaac J. Wistar Institution. The Isaac J. Wistar Institution decided that it would be preferable to involve a group of highly reputable builders to create an appropriate residential development plan for After All. Subsequently, on June 18, 1990, The Isaac J. Wistar Institution entered into a written agreement of sale with Henry S. Belber, II, Bernard Drudding, III, O. John Fuchs, Jr., W. Todd Pohlig and Sherman R. Reed, Jr. ('Builders'). Pursuant to the terms of this agreement of sale, the Builders were authorized to proceed to file and pursue approval of the subdivision plan now pending decision by the Board of Commissioners. Attached hereto are copies of certain relevant portions of the Agreement (pages 1, 2, 3, a portion of 4, 24, and Exhibit 'B') necessary to establish the respective interests of The Isaac J. Wistar Institution and the Builders in After All.

By decree dated October 10, 1990, copy of which is attached hereto, the Honorable Louis D. Stefan approved the award of "After All" to the Isaac J. Wistar Institution by the Fiduciaries.

In the subdivision application filed by applicant, Frederick C. Fuchs, P.E., agent, 'Wistar Institute' is listed as the equitable owner rather than The Isaac J. Wistar Institution. This technical correction will be noted on the subdivision plan together with a notation of the equitable interest of the Builders.

At the Planning Commission meeting held on November 12, 1990, a question was raised as to whether The Wistar Institute or The Isaac J. Wistar Institution is the equitable owner. This issue had not been raised previously by the Township. I explained at that meeting that The Isaac J. Wistar Institution, not the Wistar Institute, is the equitable owner.

I am enclosing a copy of a letter dated November 7, 1990 from Edwin R. Boynton, Esquire, attorney for the Fiduciaries of the Edwards Estate and Trust, to Charles F. Ward, President of the board of Commissioners, wherein Mr. Boynton confirms many of the facts I have described above and also indicates that '[t]he Fiduciaries are totally committed to supporting Wistar in its pursuit of a special exception and in its pursuit, with the developers who were selected with great care by Wistar, of land development plans.'

It is clear from the documentation provided, that The Isaac J. Wistar Institution and the Builders have legal standing to bring the subdivision application. We intend to amend and refile with the zoning Hearing Board the special application [sic] on the 10.7–acre core portion of After All and will name The Isaac J. Wistar Institution as equitable owner.

I trust this letter resolves the standing issue raised by the Planning Commission. Should you have any questions, however, please call.

It is important to note that even though the letter requested that the Planning Commission contact the Institution's counsel if it had any questions regarding standing, there was no attempt by the Planning Commission or the Board before the meeting of November 21, 1990 to seek more information.

The trial court, however, sustained the denial for lack of standing on a ground other than that stated by the Board. The trial court said: "Conspicuously absent from the record is the 'Isaac J. Wistar Institution Agreement,' or any other evidence showing that property rights, contingent or otherwise, accrued in the Institution." The trial court then concluded that standing was a question of credibility for the Board to resolve. However, the trial court was careful to note as follows:

The Court notes here that it does not intend anything in this Opinion to indicate that it has found that the trustees of the Edwards estate did not in fact transfer to the Institution ownership rights or any other rights in the parcel. The Court merely states that it must follow the Commissioners'

determination that Appellants have failed to include evidence of such transfer in the record.

*Belber v. Lower Merion Township* (No. 90–22566, filed September 10, 1993), slip op. at 11–12.

The objection to the builders' standing under the circumstances of this case is supertechnical. There is no doubt that *as a matter of fact* the fiduciaries of the estate and trust under the will of Jadwiga Edwards validly selected the Wistar Institute as the recipient of the property. There is equally no doubt that the Wistar Institute created the Institution to develop and operate After All. There is also no doubt that the fiduciaries entered into a contract with the *Institution* on May 16, 1990.[5]

We therefore hold that the Institution and the builders have standing and that it was an abuse of discretion for both the Board and the trial court to deny the sketch plan because of lack of standing.

### Remaining Reasons Given in Support of the Denial

The Board also based its denial of sketch plan approval on provisions in the township code. Three of those grounds remain for our disposition.

The first objection has as its basis township code section 101–5.A(2)(c) and is as follows:

The existing property in the Upper Mill Creek Watershed is characterized by approximately twenty-three (23) acres of woodland and field, and ten (10) acres of estate lawn and landscaping. The site has an impervious surface coverage of approximately 3.5%. The layout and design of the proposed development eliminates the woodland and fields, creating a suburban community with an impervious surface

---

5. The agreement is attached to the builders' brief as "Exhibit B." While ordinarily, we would not accept this as evidence, under the circumstances of this case where the Institution attempted to clear up the question of standing before by the letter of November 14, 1990, and where the trial court noted the absence of the agreement (a ground not relied upon by the Board for the denial), we conclude it would be manifestly unjust to deny the reality of the situation.

coverage of approximately 22% to 30%. Therefore, the Tentative Sketch alters existing groundwater recharge patterns and does not conserve groundwater resources.

An effort should be made to concentrate development on portions of the property, leaving other portions largely undisturbed.

Section 101-5.A(2c), Site Planning, of the Township Code states:

Conservation of surface and groundwater resources . . . In addition to the above, the following activities shall be minimized . . .[6]

Grading and other disturbances to (including the construction of retention/detention basins), or the creation of impervious cover on areas producing relatively high rates of groundwater recharge. The location and extent of such areas shall be determined for each applicant's property on the basis of its geologic, soil, slope and cover conditions.

Second, the Board cited section 101-5.B(1)(b) of the township code and stated:

Based on the natural features inventory provided by the applicant and site visits by Township staff and the Environmental Advisory Council, the site design of the Tentative Sketch Plan does not protect or preserve wildlife habitat. The even distribution of residential lots on the twenty-three (23) acres of woodland and field converts the habitat into patches of suburban lawn and landscaping.

6. The township code defines "minimize" in section 101-3 as follows: MINIMIZE—To reduce to the smallest amount possible using best management practices. 'Minimize' shall not mean complete elimination but shall require the most substantial efforts possible under the circumstances have been taken to reduce the adverse effect of the action required to be minimized. With respect to activities, the conduct of which is adverse to the conservation of the natural features of land, the requirement to 'minimize' shall include but not be limited to the requirement that the placement of dwellings and other structures and the location of roads, sedimentation and erosion control devices and earthmoving activities shall be planned and designed so as to permit the adverse effect of the activity in question to be reduced to the smallest amount possible under circumstances consistent with the otherwise permitted development.

An effort should be made to concentrate development on portions of the property, leaving areas of woodland, field and wildlife habitat undisturbed.

Section 101–5.B.(1b), Site Planning, of the Township Code states:

Conservation of woodlands and other vegetation. Except in conjunction with routine property maintenance, the following regulations shall apply: . . . .

Disturbance to vegetation other than woodlands which provides wildlife food and cover or visual amenity shall be minimized. This may include, but not necessarily be limited to, single or groups of specimen trees, hedgerows, formal gardens, and other vegetation not considered as woodland.

[4] The Board's final ordinance-based objection cites section 101–14.A(3)(g). It is as follows:

The Tentative Sketch Plan's 'Conservation Plan', Sheet No's. 2 and 3 of the submitted plans, inventories the site's existing natural features. Based on a site visit by the Township's Environmental Advisory Counsel, the plan has discrepancies between tree sizes noted on the plan and field measurements of several specimen trees. Information concerning existing wildlife habitats was not provided.

Section 101–14.A(3g) of the Township Code states:

Vegetative cover conditions on the property according to the general cover type, e.g., cultivated land, . . . old field, hedgerow, woodland, individual fee-standing [sic] trees over 6″ caliper diameter, specimen trees over 20″ dbh . . . etc. For all woodlands, the applicant shall indicate the principal species of dominant and co-dominant trees and the shrub understory. Drip lines for trees shall be shown on the plan.

Section 101–14.A.(4) of the Township Code states:

Existing wildlife habitat. Where applicable, existing wildlife habitats and food sources shall be shown on the property base map.

The builders make one argument common to all three of these reasons for denial. They argue that, because the information is more properly the subject of a preliminary plan than

of a tentative sketch plan, the lack of information and discrepancies cannot stand as valid bases to deny the sketch plan. We agree. The ordinance is quite clear with respect to the requirements of the sketch plan. Section 135–16 provides as follows with respect to the information provided in the sketch plan:

§ 135–16. Tentative sketch.

The tentative sketch may be in pencil and need not be drawn to scale. It shall be based upon Tax Map information at a scale not less than two hundred (200) feet to the inch, shall show the entire tract on one (1) sheet and shall include the following information unless waived by the Planning Director:

A. Name of owner.

B. Number of lots in the proposed subdivision or land development.

C. Zoning district and requirements.

D. Existing structures in the portion to be subdivided or developed.

E. Existing structures within two hundred (200) feet of the tract.

F. Existing wooded area in the portion to be subdivided or developed.

G. Name and address of all adjoining owners.

H. Portion of the tract to be subdivided or developed.

I. Stream (and direction of flow) through tract and within two hundred (200) feet of tract.

J. Existing utility easements, floodplain easements, conservation easements and rights-of-way.

K. A key map at a scale of one (1) inch equals two thousand (2,000) feet, clearly showing the location of the proposed subdivision or land development within the township and in relation to major streets and political boundaries.

L. Existing and proposed streets and other proposed improvements.

M. Soil type, limitation and classification as required by § 135–17B(8)(a), (f) and (g).

N. Topography and existing and proposed drainage patterns.

O. Area(s) to be set aside for stormwater management.

Nowhere in those requirements is there any suggestion that, at the tentative sketch plan stage, the applicant must show he is minimizing the impervious cover or minimizing the disturbance of the wildlife cover. Nor does this section provide that a developer must *indicate* the wildlife cover.

As can be seen, Section 135–16.M, which provides

Soil type, limitation and classification as required by § 135–17(8)(a), (f) and (g)

refers to section 135–17 (preliminary plans) and incorporates three specific parts of that code provision.[7] Thus, the persons who drafted the ordinance were well aware of the method by which certain requirements of the preliminary plan could also be made requirements of the tentative sketch plan. That there are in Section 135–16 no other specific references to requirements of the preliminary plan is support for our conclusion that the reasons given for denial are those properly to be considered at the preliminary plan stage.

On the other hand, when we turn to those portions of the ordinance governing the *preliminary* subdivision plans, specifically, section 135–17.B(11), we find a requirement that "[f]or parcels five (5) acres or larger, a conservation plan overlay must also be submitted." Section 135–20 is, in turn, entitled "Conservation plan overlay" and sets out in detail all of the requirements of a conservation plan. Section 135–20 concludes with what is required in critical impact areas, stating expressly that the following information is required:

1. A statement of impact upon critical areas and of adverse impacts which can not be avoided.

7. Those subsections require specific criteria in the naming and typing of soil and are not pertinent to the denial of sketch plan approval in question here.

2. Environmental protective measures, procedures and schedules to minimize damage to critical impact areas during and after construction.

3. A list of all licenses, permits and other approvals required by municipal, county or state law and the status of each.

4. A listing of steps proposed to minimize environmental damage to the site and region during construction and operation.

This information is to be contained in the conservation plan overlay, which is made a required component of the *preliminary* subdivision plan of five acres or more by section 135–17.B(11). The ordinance makes no mention of it as a requirement of the tentative sketch plan.

We, therefore, reverse the decision of the trial court and order the township to approve the tentative sketch plan submitted by the builders. However, in order that our decision will not be misconstrued, we hasten to add that we in no way intend to foreclose the township from any ruling after the submission of the preliminary plan that such plan does not conform to or satisfy the portions of the ordinances previously cited as violated by the tentative sketch plan.

Finally, we observe that the apparent underlying basis for the dispute is the township's opinion that a better plan (such as a cluster plan or lot averaging) for the development of the tracts could be utilized and the builders' seeming refusal to make any changes to the layout in their sketch plan. The parties engaged in the controversy became even more intractable once the builders became convinced that the township wanted to force upon them the cluster plan which was the subject of a pending ordinance. This Court suggests that all parties at the next stage approach the situation with a spirit of compromise so that an equitable solution can be effected.

## *ORDER*

AND NOW, this 31st day of March, 1994, the order of the Court of Common Pleas of Montgomery County, No. 90–

22566, dated December 29, 1992, is hereby reversed and the case is remanded to that court to order the Lower Merion Township Board of Commissioners to approve Appellants' tentative sketch plan.

Jurisdiction relinquished.