839 A.2d 1021

In re PETITION OF DOLINGTON LAND GROUP and Toll Bros., Inc. from the Decision of the Zoning Hearing Board of Upper Makefield Township,

Appeal of Dolington Land Group and Toll Bros., Inc.

Mary Jane and Calvin Larson, Frances Bielski, Carol Stuckley, Otto Schneider and Robert Mutschler Larson, Appellees/Intervenors.

Supreme Court of Pennsylvania.

Argued Oct. 21, 2003.

Decided Dec. 30, 2003.

John A. VanLuvanee, Doylestown, for Dolington Land Group, et al.

John B. Rice, Perkasie, for Upper Makefield Twp.

William J. Bolla, Doylestown, for Upper Makefield Tp. Zoning Hearing Bd.

Thomas L. Wenger, Harrisburg, Tracy Lynn Updike, amicus curiae for Bucks County Ass'n of Tp. Supervisors.

Terry W. Clemons, Doylestown, amicus curiae for Bucks County Ass'n of Tp. Officials.

Thomas W. Scott, Harrisburg, amicus curiae for 10,000 Friends of Pennsylvania.

Robert J. Sugarman, Philadelphia, for Mary Jane and Calvin Larson, et al.

Before CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## *OPINION*

Justice LAMB.

We granted allowance of this appeal in order to describe the application of *Surrick v. Zoning Hearing Board of the Township of Upper Providence*, 476 Pa. 182, 382 A.2d 105 (1977), to the assessment of the validity of a multimunicipal zoning ordinance. Such regional land use planning and regulation is now authorized by Article VIII–A of the Pennsylvania Municipalities Planning Code (MPC), the Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10801–A through 10821–A, added by Act No 68 of June 22, 2000.[1]

The central Bucks County municipalities of Newtown Township, Newtown Borough[2], Upper Makefield Township and Wrightstown Township (collectively: the Jointure) initiated in 1975[3] the data collection, mapping studies, and preparation of

---

1. Prior to these amendments, although multimunicipal planning and zoning was authorized under the MPC, only four municipal jointures had been formed across the state: one each in Allegheny, Berks, Bucks, and Montour Counties. See Governor's Center for Local Government Services, 1999 Ann. Rep. On Land Use (2000) (1999 Land Use Report) at A–48. The legislation of the Bucks County jointure is the object of this appeal. In contrast, as of July 2002, the Center identified 172 multimunicipal and joint planning efforts encompassing 541 of the Commonwealth's 2,566 municipalities in 32 counties. 2002 Land Use Report at 14.

2. For reasons unrelated to the issues here involved, in or around 1993, Newtown Borough withdrew from the jointure.

3. We note that the challenge to the substantive validity of Wrightstown Township's Zoning Ordinance of 1971 for failure to adequately provide

inventories of environmental resources and constraints and existing land uses which, when combined with the communities' prescriptive vision, would serve as the foundation for a joint municipal comprehensive plan (JCP). The MPC, as it was in 1975, included express authority for such multimunicipal planning but the power to enact multimunicipal zoning legislation first appeared in the MPC amendments made the subject of Section 7 of the Act of October 5, 1978, P.L. 1067, adding MPC §§ 11101–A through 11108–A.[4]

The Jointure continued its efforts and, in 1983, promulgated its JCP and a joint zoning ordinance (JZO). These were supplemented and supported at the outset by the first of a series of planning reports entitled "Development Area Analysis" by which the Jointure's professional land planners, with funding from the Pennsylvania Department of Community Affairs, systematically documented the ability of the JZO in conformity with the policy statements contained in the JCP to

for townhome development, ultimately decided in favor of the township in *In Re: Appeal of M.A. Kravitz Co., Inc.,* 501 Pa. 200, 460 A.2d 1075 (1983), was initiated as a demand for a curative amendment filed on May 7, 1975. *Id.,* 53 Pa.Cmwlth. 622, 419 A.2d 227, 227–28 (1980), *rev'd,* 501 Pa. 200, 460 A.2d 1075 (1983). The seminal decision of this Court, invalidating the zoning ordinance of another central Bucks County municipality, Warwick Township, and further creating the doctrine of "definitive relief" by which the successful challenging developer receives the reward of plan approval, was issued the previous year. *See Casey v. Zoning Hearing Board of Warwick Township,* 459 Pa. 219, 328 A.2d 464 (1974).

4. This statutory authority followed Judge Theodore O. Rogers's perceptive and prescient opinion for the Pennsylvania Commonwealth Court holding that a multimunicipal comprehensive plan, by itself, provided no protection to the member municipalities in a zoning ordinance validity challenge. The Court touted the benefits of regional zoning: "It might be a very good thing for the General Assembly to empower municipalities to enter binding regional zoning arrangements.... If the regional zoning ordinance should provide the region's "fair share" of housing needs, each constituent municipality could then be developed in accordance with best planning principles applied purely, and not with an eye to what might pass constitutional muster." *Nicholas, Heim & Kissinger v. Harris Township,* 31 Pa.Cmwlth. 357, 375 A.2d 1383, 1385 (1977). The provisions cited were subsequently repealed by the Act of December 21, 1988, P.L. 1329. Similar provisions authorizing multimunicipal planning and zoning are now found in MPC Article VIII–A, 53 P.S. §§ 10801–A through 10821–A.

accommodate the Jointure's share of the region's need for higher density, more affordable housing.

Specifically, using data from the 1980 United States Decennial Census, the Bucks County 1979 Housing Plan, and local information concerning project approvals and permits issued, the planners compared the projected need for multi-family housing units during the time period from 1980 to 2000 with the capacity of those presently undeveloped lands zoned to permit such housing under the JCP and JZO; and concluded that there was more than adequate capacity for these uses over the time horizon studied.[5]

The JCP and JZO, then and now, divide the four-municipality region into a primary growth area in the traditional regional core, Newtown Borough and the contiguous portions of Newtown Township, and secondary growth areas in Wrightstown Township in the area of Anchor and in the eastern portion of Upper Makefield Township along the Delaware river between Yardley and Washington Crossing. In addition, large sections of the Jointure—including the central portion thereof in northern Newtown Township and proceeding north through western Upper Makefield Township and the Jericho Mountain area—were found to be characterized by severe environmental constraints and active farming on prime agricultural soils and were reserved as conservation management areas from which intense development was to be redirected to the primary and secondary growth areas.

The substantive validity of the JZO was challenged in 1992 and in 1994; the trial court in both cases and the intermediate appellate court in the former case rejecting the challenges. *See Hudachek v. Zoning Hearing Board of Newtown Borough,* 147 Pa.Cmwlth. 566, 608 A.2d 652, 656 (1992), and *Newtown Land Limited Partnership v. Zoning Hearing Board of Newtown Township,* 30 Pa. D. & C. 4th 170 (Bucks

5. The planners also "acknowledge[d] that it is not possible [in 1983] to plan for the ultimate development of the predominantly rural communities. Changing circumstances, such as the significant changes in the economic and energy situations of the late 1970's and early 1980's, limit the time horizon to the immediate future." 1983 Development Areas Analysis at 1, R.R. at 2037a.

Cty.1996). The trial court's order upholding the JZO in the Newtown Land Limited Partnership challenge was entered on January 19, 1996.

Shortly thereafter, on February 15, 1996, a group of eight landowners, using the registered fictitious name "Dolington Land Group" (Applicant or Dolington Group) referring to the location of their assembled parcel near the historic village of Dolington in Upper Makefield Township, commenced the instant challenge to the validity of the JZO by filing an application for a public hearing before the Upper Makefield Township Zoning Hearing Board (ZHB or Board). The properties of the challengers (referred to collectively as the Subject Property) are contiguous and aggregate about 311.56 acres located generally north of Stoopville Road and Washington Crossing Road and are divided by Highland Road; primarily within a CM–Conservation Management zoning district with a small portion located in a VR–Village Residential zoning district as defined and regulated by the JZO. The seven stated bases for the challenge in fact raise two issues: (1) whether the JZO as a whole makes inadequate provision for higher-density, multi-family housing; and (2) whether the CM–Conservation Management zoning district regulations, considered in their aggregate effect, unreasonably restrict the right of the Dolington Group to develop and use her land.[6]

An initial hearing was scheduled by the Board for April 11, 1996, but, by letter dated April 9, 1996, the challengers' counsel sought an indefinite suspension of the proceedings "in order to provide the Applicant and the Township with an opportunity to explore the possibility of a mutually satisfactory resolution of the issues raised by the substantive challenge." Exhibit B–3; R.R. 2279a. The request for suspension was also prompted by the formal announcement on March 7, 1996, by the governing bodies of the Jointure members of

6. In addition, challenges raised initially to the reasonableness of the JZO's regulations applicable to housing for the elderly and to the JZO's requirement in the case of a validity challenge that the challenger post a $15,000.00 bond for costs, were not the subject of proof or argument before the zoning board and were on that account deemed to have been withdrawn. ZHB Decision at 64 n. 2; F.F. 179–181.

their intention to reexamine the issue of the continuing validity of the JZO under MPC §§ 609.2 and 812–A, 53 P.S. § 10609.2 and 10812–A.[7]

On April 3, 1996, the Jointure members formally enumerated those provisions of the JZO requiring further validity study and, on August 29, 1996, the Jointure members each enacted an amendatory ordinance revising a number of provisions of the JZO generally in order to provide greater flexibility in the design of residential developments and increasing the permitted intensity of such developments.

There the matter stood until, in April, 1998, the Dolington Group entered into an agreement of sale to convey the Subject Property to Toll Bros., Inc. (Toll) and, by letter dated December 14, 1998, the Dolington Group's counsel notified the ZHB of the intent of the Applicant to proceed with the public hearing before the Board. Thereafter, eighteen sessions of a public hearing in the matter of the validity challenge were conducted by the Board between February 8, 1999 and August 28, 2000. The Dolington Group and Toll entered their appearances by counsel as the moving parties and Upper Makefield Township, the Upper Makefield Open Space Alliance, the Delaware River Keeper Network, the Sierra Club, and 67 individual residents and owners of properties in the vicinity of the Subject Property entered their appearances in opposition to the challenge.

Expert land planners, civil engineers, soils and wetlands scientists, municipal officials, an expert in farmland preservation, and other witnesses both expert and lay gave extensive testimony before the Board and hundreds of pages of documentary evidence were admitted into evidence. During the course of the proceedings, in January 2000, a newly appointed member of the Board was seated and a new solicitor for the Board was selected. Each initially expressed his intent to

---

7. Considering similar circumstances in *C & M Developers, Inc. v. Bedminster Township Zoning Hearing Board*, 573 Pa. 2, 820 A.2d 143 (2002), we held that the municipality's invocation of the statutory municipal cure provisions of MPC § 609.2 does not constitute an admission of the ordinance's invalidity. The Dolington Group does not here seriously contend otherwise.

review the record made to that point and each received on that basis the agreement of all parties that he might participate in the remaining sessions and in the decision. Ultimately, however, the newly appointed Board member determined that he could not successfully undertake a review of the extensive prior proceedings and, with the agreement of all parties, the Board continued from that point with new counsel and two members.

Following the final evidentiary session on August 28, 2000, written argument was submitted on October 9, 2000, and a special session for receipt of oral argument was conducted on October 23, 2000. The Board's decision rejecting the challenge, encompassing 181 factual findings and more than thirty pages of reasoning and discussion of authorities, was issued in accordance with the agreement of the parties as to timing on November 27, 2000.

The Dolington Group's initial appeal to the court of common pleas was denied by an opinion and order of Judge David W. Heckler dated December 27, 2001, described as thorough and well-reasoned and adopted by the Commonwealth Court in an unreported decision of a panel thereof entered on July 3, 2002. This appeal followed by our allowance.

Our review encompasses the decision of the ZHB and, in cases like that here presented where the trial court has received no additional evidence, is limited to determining whether the Board abused its discretion or erred as a matter of law. *C & M Developers, Inc. v. Bedminster Township Zoning Hearing Board*, 573 Pa. 2, 820 A.2d 143 (2002). Moreover, The Zoning Board as factfinder is the sole judge of credibility with power to resolve conflicts in the testimony and to reject even uncontradicted testimony that it finds to be lacking in credibility. *Nettleton v. Zoning Board of Adjustment*, 574 Pa. 45, 58, 828 A.2d 1033, 1041 (2003).

The Dolington Group here presses two independent challenges to the validity of the JZO. In the first of these, it is asserted that the JZO considered as a whole makes inadequate provision for multi-family development and is, on that

account, invalid under the rule and analytic paradigm described in this Court's *Surrick* decision. In *Surrick*, Mr. Justice (later Chief Justice) Nix, writing for a majority of the Court, synthesized from a large body of law in this and other jurisdictions, "a useful analytic method" to be employed in the judicial assessment of the validity of zoning enactments. The tri-partite method begins with an examination of the subject municipality's location in or outside of "the path of urban-suburban growth." For communities in the path of such growth, the analysis proceeds to an examination of the present state and stage of the community's development. Finally, with respect to communities in the path of growth and not yet highly developed, the analysis concludes with an assessment of the degree to which the challenged regulations have the effect of excluding higher-density, multi-family residential uses.

The *Surrick* decision, entered in 1977 and concerning a 1971 challenge to a 1952 zoning ordinance, contains no explicit reference to the joint municipal zoning first authorized in 1978. A number of the appellees herein invite this Court, in the light of such innovations and of newly recognized and ascendant land use policy objectives such as the protection of environmentally sensitive lands, agricultural activities and prime agricultural soils and the elimination or mitigation of urban and suburban sprawl, to abrogate either the obligation under *Surrick* to provide for a proportionate share of the regional need for higher-density, multi-family development or the availability of punitive "definitive relief" under the rule of our decision in *Casey v. Zoning Hearing Board of Warwick Township*, 328 A.2d at 469. We decline this invitation. As we will shortly explore in detail, the analytic method described in *Surrick* is sufficiently flexible in its proper application to accommodate the evolution of public land use priorities and concerns. Since we here decide that no relief is warranted, this case provides an inappropriate context in which to revisit the issue of the necessity of definitive relief to discourage unlawful municipal action and to reward successful landowner challenges.

In the context of a challenge to a multi-municipal enactment like the JZO, the first stage of the *Surrick* analytic method presents particular difficulties. Only municipalities within the path of urban and suburban growth are properly subject to the analysis of *de facto,* partial exclusion of multi-family dwellings under *Surrick.* See, for example, *Appeal of M.A. Kravitz Co., Inc.,* 460 A.2d at 1083, in which the plurality concluded that Wrightstown Township, Bucks County, one of the instant Jointure members, was properly found by its zoning hearing board to be outside the path of growth and, therefore, unsuited to the *Surrick* exclusion analysis.

The ZHB here made the alternative finding, supported on appeal by Appellee Township and by the amicus curiae 10,000 Friends of Pennsylvania and Bucks County Association of Township Officials, that Upper Makefield Township is not within the path of urban and suburban growth for these purposes and that the *Surrick* exclusionary analysis is, therefore, inapposite. The Dolington Group, on the other hand, places its reliance on MPC § 1006-A(b), 53 P.S. § 11006-A(b), having to do with judicial relief on appeal, which, in terms similar to MPC § 811-A (repealed), provides:

(b) Where municipalities have adopted a joint municipal comprehensive plan and enacted a zoning ordinance or zoning ordinances consistent with the joint municipal comprehensive plan within a region pursuant to Articles VIII-A [Joint Municipal Zoning] and XI [Intergovernmental Cooperative Planning and Implementation Agreements], the court, when determining the validity of a challenge to such a municipality's zoning ordinance, shall consider the zoning ordinance or ordinances as they apply to the entire region and shall not limit its consideration to the application of the zoning ordinance within the boundaries of the respective municipalities.

The Dolington Group contends that the clear meaning of this provision in the present context is to demand that, in our consideration of the "path of growth" issue under *Surrick,* we must direct our attention to the entire Jointure and that we may not, consistent with the statute, limit our consideration to

the Jointure member in which the Subject Property is located: Upper Makefield Township.

Great significance is ascribed to this issue, particularly by the amicus curiae. For example, Amicus 10,000 Friends of Pennsylvania writes:

> One argument advanced by Appellants Dolington Land Group is particularly damaging to the entire notion of joint municipal planning and zoning.... [The Dolington Group asks] the Court to find that Upper Makefield Township, an area otherwise not in the path of growth or a logical place for growth, be treated as if it is within the path of growth and a logical place for population growth and development for the purposes of the *Surrick* analysis *solely because it is part of a jointure where those facts are true of another municipality in the jointure.* If that interpretation prevails, there will be a complete disincentive for any municipality on the fringe of development that could well benefit from joint planning and zoning to join with any municipality that already faces more developmental pressure.... That would sound the death knell for multi-municipal planning and zoning.

Brief at 15–16 (emphasis in the original). Hyperbole aside, there is some support for Appellees' contention that MPC § 1006–A(b) was not intended to influence the "path of growth analysis" but, instead, was designed and intended to alter the rule of such cases as *Nicholas, Heim & Kissinger v. Harris Township* requiring each municipality, even if involved in joint land use planning, to provide within its separate geographic boundary, zoning districts permitting every lawful land use. See, for example, the discussion of the Commonwealth Court in *Hudachek v. Zoning Hearing Board of Newtown Borough*, 608 A.2d at 656–57, of the issue of the effect of multimunicipal planning on the analysis of zoning ordinance validity—an issue which the court described as one of first impression.

Section 916.1(h) of the MPC, 53 P.S. § 10916.1(h) contains a directive addressed to the tribunals with original jurisdiction of zoning ordinance validity challenges—the municipal governing body and zoning hearing board—parallel to that addressed

to the judiciary in MPC § 1006–A(b), 53 P.S. § 11006–A(b), and providing that:

> The zoning hearing board or governing body, as the case may be, shall consider the availability of uses under zoning ordinances within the municipalities participating in the multimunicipal comprehensive plan within a reasonable geographic area and shall not limit its consideration to the application of the zoning ordinance on the municipality whose zoning ordinance is being challenged.

MPC § 916.1(h), 53 P.S. § 10916.1(h). This formulation clearly expresses the legislative will that the reviewing agency's required broadened perspective is concerned with the availability of land uses under the challenged zoning provisions, not with the delineation of the geographic scope of the path of growth.

Both of the provisions just described were added to the MPC by the Act of June 22, 2000, P.L. 483, No. 67, which, along with Act No. 68 enacted the same day are widely referred to as Pennsylvania's "Growing Smarter" Initiative. This initiative was the legislative culmination of a process that began with the issuance on July 1, 1997 of Governor Thomas J. Ridge's Executive Order No.1997–4 creating the 21st Century Environment Commission charged with the responsibility of recommending environmental priorities, proposing strategies to meet the priorities and evaluative criteria to measure progress toward the recommended goals, and reporting periodically on the Commission's activities. In its first report, issued in September 1998, the Commission identified urban sprawl [8] and the need to create sound multimunicipal land use

---

**8.** The term "sprawl" is typically used to describe development that is inefficient in its use of land (i.e. low density); constructed in a "leap frog" manner in areas without existing infrastructure, often on prime farmland; automobile dependent, and consisting of isolated single use neighborhoods requiring excessive transportation. Statistics underscore the extent to which sprawl is a pressing problem throughout this Commonwealth. Between 1960 and 1990, while the population of Pennsylvania's largest metropolitan areas grew by 13%, their developed land area nearly doubled. Between 1970 and 1997, Pennsylvania lost 24,000 farms representing 25% of the total state farm acreage, to development. *See* Executive Order 1999–1 issued January 5, 1999.

policies as the most pressing environmental issue facing the Commonwealth. The report further described the proposed legislation that became the Growing Smarter Initiative and, ultimately, Acts Nos. 67 and 68 of 2000.

This Court has long recognized the need for and potential of multimunicipal planning and zoning. As Mr. Justice Roberts wrote in *Concord Township Appeal*, 439 Pa. 466, 268 A.2d 765 (1970): [9]

> We fully realize that the overall solution to these problems lies with greater regional planning; but until the time comes that we have such a system we must confront the situation as it is. The power currently resides in the hands of each local governing unit, and we will not tolerate their abusing that power in attempting to zone out growth at the expense of neighboring communities.

268 A.2d at 769.

Whatever abstract force the Dolington Group's position on the path of growth issue derives from MPC §§ 916.1(h) and 1006-A(b), however, no evidence was adduced before the Board sufficient to compel a conclusion that this Jointure is, considered in its parts or as a whole, within the path. Population growth figures adduced by the Jointure's planner demonstrate a rapid increase in decades past and a more modest increase in recent periods. The Jointure is served by neither mass transit nor major highways and we have previously written, in a decision filed in the same year in which the JCP and JZO were enacted, that the zoning hearing board of one of

Between 1982 and 1997, developed land in Pennsylvania increased by 41.3% while the population remained essentially constant. During this period 94% of the development occurred on land previously used for farming. 1999 Land Use Report at A-1. Pennsylvania ranks fifth in the nation (behind Texas, Georgia, Florida, and California) in the rate of land conversion due to development. National Resources Conservation Service "State Rankings by Acreage and Rate of Non-Federal Land Developed: 1982-1997". An excellent introduction to the problem of sprawl in Pennsylvania and the need for multimunicipal land use regulation, with an emphasis on the region here at issue, can be found in Thomas Hylton's Save Our Land, Save Our Towns (1995 R & B Books, Harrisburg, Pa.).

**9.** Also frequently referred to as *Appeal of Kit-Mar Builders, Inc.*

the Jointure members, Wrightstown Township, "properly determined that the Township is not a logical place for rapid growth and development, although some population expansion may be anticipated." *M.A. Kravitz*, 460 A.2d at 1082. In addition, we there wrote:

> The record reveals that Wrightstown Township is approximately 37 miles from Philadelphia and 18 miles from Trenton, and that no major highways link the Township with these communities. No major employers are presently located within the Township, nor in any of the immediately surrounding townships. The major employment centers other than Philadelphia and Trenton are Doylestown, approximately 10 miles to the northwest; Lower Bucks County, approximately 12 miles to the south; and Montgomery County, about 15 miles to the southwest. Wrightstown is not serviced by any form of mass transportation, rural bus, or commuter transit to any of these employment centers.
>
> . . . .

*Id.* (record citations omitted).

Given the significance of this issue and the paucity of the evidentiary record in this case, we have determined to leave for another day the question of the proper application of *Surrick*'s threshold inquiry to the zoning legislation of a multimunicipal jointure. The Board found both that the Dolington Group failed to meet this threshold burden and that, even if the burden had been met, the challenge would fail at the third stage. As the remainder of this discussion will demonstrate, we agree with the latter point and it is not, therefore, necessary to the resolution of the issues before us that we revisit the fact-finder's efforts concerning the threshold issue.

▮ The Board here found and we are satisfied that, in fact, the JZO has not produced the exclusionary effect prohibited by *Surrick*. The Court there described the analytic method to be employed by the agencies possessed of original jurisdiction of zoning ordinance validity challenges like that here presented involving an alleged partial or *de facto* exclusion of multi-

family dwellings and by the judiciary on appeal, in the following terms:

> In resolving this issue [of the ordinance's validity], once again the percentage of community land available under the zoning ordinance for multi-family dwellings becomes relevant. This percentage must be considered in light of current population growth pressure, within the community as well as the region, and in light of the total amount of undeveloped land in the community. Where the amount of land zoned as being available for multifamily dwellings is disproportionately small in relation to these latter factors, the ordinance will be held to be exclusionary.

*Surrick*, 382 A.2d at 111. In this regard, the Dolington Group adduced the testimony of a land planner that on the date of filing of the challenge in February 1996, 9,135 acres of residentially zoned lands in the Jointure remained undeveloped. Comparing this figure to the combined area of the undeveloped properties located in the three zoning districts [10] which, under the JZO, permit multi-family development: 327.33 acres, the Dolington Group emphasizes that of the undeveloped land zoned to permit residential development in the Jointure at the time of the filing of the Substantive Challenge, 3.58% was located in zoning districts permitting the development of multi-family dwellings. This consideration is sufficient, in the view of the Dolington Group, to establish the invalidity of the JZO.

The Jointure makes, in effect, three responses. It first contests the challengers' figures, contending that the expert employed certain invalid assumptions which had the effect of reducing the area of available land in multi-family zoning districts while increasing the total available land figure. In this regard, Appellees next contend that this Court ought no longer to countenance the equation of productive agricultural land with land available for development. Instead, in Appellees' view; which is said to be consistent with the expressions of legislative and executive intent to value, preserve, and facilitate active agriculture in this Commonwealth, lands de-

---

10. R–1, R–2, and CR–2.

voted to agriculture should be categorized, just like lands devoted to any other productive use, as *unavailable* for new development. This construct, it is argued, would have significantly altered the expert's figures and conclusions.

Finally, it is argued that the numbers 327.33 acres and 3.58%, even if accurate and representative of the true proportion of available land zoned for multi-family development, have meaning only in the context of the projected need for multi-family development in the Jointure. On this subject, Michael Frank, a land planner employed by the Bucks County Planning Commission's Community Planning Division from October 1973 until June 1987, including service as the principal professional consultant to the Jointure and its members during the preparation of the JZO and JCP and subsequently, testified that he had, prior to these proceedings before the Board, three times performed the detailed analysis required in order to confirm the continuing validity of the JZO under *Surrick* and that on each of these occasions, he had concluded that the JZO made adequate provision for the development of a range of housing types including sufficient multi-family dwelling units to meet the projected need and demand therefor.

The analyses were performed, according to the witness, in connection with the original formulation of the JZO in the period from 1975 to 1983, during which the initial mapping and data collection was completed, again as a component of a reevaluation of the JCP in 1988 through 1990, and once again in 1996–1997. In each instance, the analysis encompassed seven steps or stages including: (1) setting a time horizon (here the initial time horizon was 1980 to 2000 and, in 1996, the time horizon was reset to 2000–2010); (2) projecting the total number of new dwelling units to be constructed within the Jointure during the time horizon on the basis of authoritative data provided by the county planning department and the State Data Center; (3) allocating a portion of the total housing unit growth to multi-family housing (in this instance the existing county-wide proportion—30%—was used in preference to the less demanding recommended figure contained in

the Bucks County Housing Assistance Strategy—25.012%); (4) converting the projected number of multi-family dwelling units to an area of required land at the maximum permitted density under the applicable zoning regulations; (5) application of a "safety factor" to account for the uncertainties in the projections and estimates—in this instance the witness employed a safety factor of 50%; multiplying the required land area by 150%; (6) cataloging the undeveloped properties zoned for multi-family use and developable area of each; and, finally, (7) comparing the sum of the properties' areas from step (6) with the product produced in step (5).

In this instance, the expert witness testified and the Board found that the area of ten parcels of undeveloped land located in R–2 zoning districts (one of the three districts in which multi-family dwellings are a permitted use) aggregated 420.6065 acres and a projected yield of multi-family dwelling units at the maximum permitted density of 3.9 dwelling units per acre of 1,640—well in excess of the calculated and projected figures representing the need for such housing during the current 2000 to 2010 time horizon.

The conclusion reached by application of the same method at the beginning of the Jointure, then using a time horizon from 1980 to 2000, also demonstrated the validity of the JZO under *Surrick.* Specifically, in 1983, the developmental potential of undeveloped lands in the Jointure's multi-family zoning districts (2,916 units) was 175% of the highest projection of the need for such housing through 1990 and 125% of the highest projected need for such housing through 1995; this without considering more than 1,750 multi-family dwelling units proposed for an elderly housing project then denominated Golden Acres.

The reevaluation performed in 1988 was memorialized in an addendum to the 1983 Development Area Analysis dated October 1, 1989; once again employing the analytic method described above in the context of the 1980–2000 time horizon to then current counts and projections and concluding that the developmental potential of multi-family zoned, undeveloped lands was 95.9% of the highest projected need through the end

of the time horizon. The addendum recommends reconsidering the data and projections when the data produced by the 1990 decennial census became available and at least every five years thereafter with modifications to the JZO in the form of text and map revisions to be legislated as they became necessary.

As we have noted, a further reevaluation in 1996 led to resetting the time horizon and to text and map amendments to the JZO designed to increase the number of multi-family dwelling units capable of development on undeveloped, appropriately zoned parcels so as to ensure that the aggregate developmental potential of these lands exceeded by a substantial factor: at least 50%, the highest projected need for multi-family housing during the time horizon.

The periodic analytic process employed by the Jointure's planning commission with the assistance and counsel of the county planning authorities and expert planners, is, in our view, an entirely appropriate method for a municipality or multimunicipal jointure to meet its obligation to provide for the proportion of the regional need for higher density, multi-family housing fairly ascribed to it. Implemented conscientiously and in good faith, this method will ensure that land is available for development of an appropriate variety of housing types on a continuous basis.

The pivotal question under *Surrick* concerns the extent to which the Jointure governing bodies have employed the zoning power "to more effectively meet the demands of [their] evolving and growing communities" or whether they have instead "shirk[ed] their responsibilities [in order] to avoid the increased responsibilities and economic burdens which time and natural growth invariably bring." *Surrick*, 382 A.2d at 112 (quoting *National Land and Investment Co. v. Kohn*, 419 Pa. 504, 215 A.2d 597, 610 (1965)).

The answer to the question just posed requires more than a numerical "snapshot" comparison of available land and projected need on a particular day chosen by the challenger. Instead, an examination of the conduct of the governing bodies

in the administration of their zoning enactments over time must be conducted. We emphasized in *Surrick* that the enumeration of factors we there compiled as relevant to the issue of zoning ordinance validity "in no way comprises an exhaustive list. Nor is any one factor necessarily controlling. We anticipate that zoning boards and governing bodies, in the exercise of their special expertise in zoning matters, will develop and consider any number of factors relevant to the need for and distribution of local and regional housing." *Id.* at 111.

In the period since our decision in *Surrick*, factors previously of little or no concern have assumed preeminence. These include but are not limited to an increased awareness of the environmental sensitivity and public value of undisturbed wetlands, floodplains, slopes, and woodlands; the growing national and state-wide awareness of the true costs of sprawl and of the need to implement contrary land use policies; and the growing recognition of the importance of agricultural lands and activities and of prime agricultural soils. Each of these factors acts to counterbalance to some extent the desire for intense development and each of these factors can properly serve in an appropriate municipal or multimunicipal context as a legitimate justification for the imposition of carefully tailored restrictions of the type, design, location, and intensity of permitted development.

In the light of the concerns just enumerated, we will next consider the Dolington Group's second issue, the challenge to the CM district regulations as unreasonably restrictive.

In challenging the provision made for residential development in the CM district in which the bulk of the Subject Property is located, the Dolington Group's evidence consisted primarily of the introduction and explanation of various plans and studies intended to establish that it was not possible in the development of the Subject Property in compliance with the CM zoning district regulations as they were in February

1996 [11], to achieve the maximum number of residential lots or units that would be permitted if only the maximum density regulations were considered. As the Board found and concluded, this evidence, even if accepted, is a reflection of the extreme natural constraints that characterize the Subject Property and says nothing about the validity of the CM district regulations.

Specifically, the Dolington Group's land planner [12] testified to his examination of the Subject Property's natural and regulatory characteristics and his conclusion that of the 292.92 acres of the Subject Property within the CM district and located outside of public road rights-of-way, 280.92 acres or 96% thereof is characterized by natural constraints which substantially limit or preclude development and 242.04 acres or 83% of the tract must be preserved pursuant to the JZO as it was in February 1996 when the challenge was filed. By this evidence, just over fifty acres or about 16% of the titled lands are available for development activities under these regulations.

The Dolington Group's planner then described his efforts to produce sketch plans of development under the three residential alternatives permitted in the CM zone: a conventional subdivision for single-family detached homes on one-acre lots, a cluster subdivision for single-family detached homes on 18,000 square foot lots, and a performance subdivision in which various configurations of detached and attached single-family homes are permitted on lots as small as 4,500 square feet. Cluster and performance subdivisions are subject to an additional active recreation requirement by which lands must be designated and reserved for this purpose equal to, in the case of cluster subdivisions, 3% of the unrestricted land or 1.53 acres in this instance and, in the case of a performance subdivision, 6% of the unrestricted land or, here, 3.05 acres.

11. The challenge was initially filed in February 1996. The regulations applicable to the CM district were among those amended by the ordinance enacted in August, 1996, some two years prior to the Dolington Group's request for commencement of the public hearing.

12. An employee of Eastern States Engineering, a wholly owned subsidiary of Toll. R.R. 963a.

The witness testified that with respect to each of the three sketch plans, his goal was to maximize the number of proposed lots while complying with the CM district regulations in effect in February 1996.

With reference to the sketch plan for a conventional subdivision, the witness concluded that of the 88 lots theoretically permitted on the Subject Property, he was only able to achieve about 30 lots in an actual sketched configuration given the particular shape, topography, and other natural constraints characterizing the parcel, the necessity to provide access to each lot, the need to reserve appropriate lands for storm-water management and on-lot sanitary sewage disposal, and, in certain instances, the requirement of particular lot dimensions in order to accommodate existing Toll product designs. Similarly, of the potential 138 lots permitted by the maximum density regulation applicable to a cluster subdivision the witness was able to design a plan with a maximum of 69 lots on the Subject Property and, of the potential 176 lots permitted in a performance subdivision, the witness was able to design on the subject property a plan with a maximum of 168 lots.[13]

The Dolington Group asserts that this evidence establishes that the combined effect of the JZO's CM district regulations applicable to the Subject Property are unreasonably restrictive. The ZHB, as the agency possessed of original jurisdiction, the Court of Common Pleas of Bucks County on initial appeal, and the Commonwealth Court on penultimate review rejected this challenge, and we are similarly unpersuaded that this evidence supports, much less compels, the conclusion of the invalidity of the CM district regulations as they were in February 1996.

In reviewing the written argument presented by the Dolington Group to the tribunals below, it is clear that the evidentia-

13. *See* Exhibit A–39. The Dolington Group also presented to the ZHB sketch plans of development of the Subject Property under the JZO CM District regulations as they were amended in August, 1996, several months after the challenge was filed, which demonstrated that the Subject Property can now be developed for at least 93 conventional lots, 114 clustered lots, or 272 performance lots. F.F. 175–177.

ry presentation we have described was offered in an attempt to establish that the maximum developmental densities permitted by the CM district regulations as they were prior to the August 1996 amendments were so deficient as to require in their defense the municipality's proof of "extraordinary justification" under the rule applied in a series of decisions of the Commonwealth Court predicated on the plurality decision of this Court reported as *Concord Township Appeal.*

This contention, which served as a central element of the challenge before the Board and the trial court, must fail as a consequence of our decision, filed more than two years after the Board's decision in the case, in *C & M Developers.* In that case, involving a challenge to the agricultural zoning of a Bucks County municipal neighbor of the Jointure, we soundly rejected both premises on which the Dolington Group's conclusion depends: that extraordinary justification is required to justify large lot zoning and that the large lots required to be so justified are those resulting from the application of the regulations at issue to particular properties rather than those described by the literal terms of the minimum lot size regulation. We held in *C & M Developers* that the presumption of legality applicable to legislation in general and zoning ordinances in particular, as a reflection of institutional deference to the legislative process, is unaffected by the nature of the legislation challenged. In challenges to the lawfulness of minimum lot sizes, as in zoning ordinance validity challenges generally, the burden remains on the challenger to rebut the presumption of legality and to "show ... that the restrictions [are] unreasonable, arbitrary, or not substantially related to the [municipality's] police power purposes." *C & M Developers,* 820 A.2d at 152–53 (citing *Concord Township Appeal,* 268 A.2d at 779–80).

We also rejected in *C & M Developers,* the premise here advanced below by the Dolington Group that the municipality's burden to advance extraordinary justification in support of the challenged regulations is triggered when the application of those regulations to a particular property produces excessive minimum lot sizes notwithstanding that the regulatory lot size

minima are, on their face, unexceptional. In *C & M Developers* the challenged regulations included a minimum lot size of one acre but the challenger "argue[d] that the extraordinary justification standard should apply because the Ordinance *results in* a density limitation of one house per every two acres or more." *Id.,* 820 A.2d at 154 (emphasis in the original). We found no support for the contention in our prior decisions and rejected the argument. *Id.*

It must also be emphasized that the Dolington Group presents no challenge to the JZO insofar as it restricts the development of floodplains, floodplain soils, wetlands, steep slopes and mature woodlands. Only the restriction of development on prime agricultural soils is the subject of particular objection together with the challenge to the aggregate effect of the regulations as a whole. We first reject the contention that prime agricultural soils are less deserving of zoning protection than are other sensitive environmental lands and resources. Just to the contrary, the MPC expressly requires each municipal and multimunicipal zoning ordinance "[t]o preserve prime agriculture and farmland considering topography, soil type and classification, and present use." MPC § 604(3), 53 P.S. § 10604(3). Moreover, "zoning ordinances shall protect prime agricultural land...." MPC § 603(g)(1), 53 P.S. § 10603(g)(1). The term "Prime Agricultural Land" is defined in the MPC, just as it is in the JZO, as "land used for agricultural purposes that contains soils of the first, second or third class as defined by the United States Department of Agriculture natural resource and conservation services county soil survey." In *C & M Developers* we "acknowledge[d the] legitimate interest in preserving ... agricultural lands." *Id.,* 820 A.2d at 158; *accord Boundary Drive Associates v. Shrewsbury Township Board of Supervisors,* 507 Pa. 481, 491 A.2d 86 (1985). The recent expressions of a legislative and executive intent to preserve the Commonwealth's farms and agricultural lands serve only to underscore the significance and propriety of the Jointure's efforts in this regard.

Nevertheless, such decisions as *C & M Developers* and *Hopewell Township Board of Supervisors v. Golla,* 499 Pa.

246, 452 A.2d 1337 (1982), make it clear that regulations designed and intended to preserve agricultural lands, while serving a laudable purpose, may "too severely, or indiscriminately, restrict landowners' rights", *Hopewell*, 452 A.2d at 1341, and, thereby, exceed the enacting municipalities' lawful powers. In this regard the cases last cited are instructive.

In *Hopewell*, the regulations at issue permitted the creation by subdivision of a maximum of five residential lots out of an existing farm property irrespective of the property's size. This Court, while recognizing that "[t]he zoning scheme of Hopewell Township has *some* relationship to the goal of preserving farmland . . ." *id.*, 452 A.2d at 1343 (emphasis in the original), concluded that the extent to which the regulations impaired protected rights of property ownership as well as the "arbitrary and discriminatory impact on different landowners", *id.*, required their invalidation.

Similarly, the regulations at issue in *C & M Developers* required the owners of agricultural tracts greater than ten acres in area to set aside 60% of the prime farmland and 50% of any remaining farmland as a "non-buildable site area." *Id.*, 820 A.2d at 148. We agreed with the tribunals below that this "set-aside" regulation was justified by the municipality's intent to preserve its agricultural lands and activities. However, the regulations at issue then additionally required the creation of "one clear acre" for each proposed lot which could contain no floodplain, floodplain soils, wetlands, lakes, ponds, or watercourses. The combined effect of these requirements was to reduce the developmental potential of the 200 acre tract from 461 lots of 10,000 square feet as proposed by the landowner to 51 one-acre lots as permitted by the challenged regulations—an 89% reduction in developmental intensity. Moreover, the owners of parcels less than ten acres in area could subdivide their lands with no such limitations.

We held that the regulations of Bedminster Township unlawfully exceeded the municipality's police power because the agricultural land set aside requirement operated in combination with the "one clear acre" requirement to further reduce the developmental potential of lands greater than ten acres in

area without the justification of providing greater protection to agricultural lands or activities.

The fundamental difference between the CM district regulations here challenged and those invalidated in *Hopewell* and *C & M Developers* lies in their primary object and effect. The regulations at issue in *Hopewell* and *C & M Developers* were primarily controls on the intensity of permitted development. The CM district regulations, in contrast, have their primary activity in the design or layout of the development of a particular property; that is, in the location rather than the amount of permitted improvements. This can be seen most clearly in the method of calculation of the maximum number of permitted dwelling units applicable to each of the three subdivision types allowed in the CM district. In each instance: conventional, cluster, and performance subdivision, the maximum number of permitted dwelling units is calculated with reference to the base site area; that is, the tract area before deducting any of the areas of natural constraint and before deducting the prime agricultural lands. The degree to which tract development is constrained by floodplain, floodplain soils, wetlands, water bodies, steep slopes, mature woodlands, and prime agricultural soils, therefore, has no necessary impact on the maximum number of permitted dwelling units.

The CM district regulations, by requiring the preservation of areas of natural constraint and large proportions of the areas of prime agricultural soil, have their primary activity in controlling a subdivision's design or layout. Secondarily, the CM district regulations operate to encourage performance or cluster subdivisions over conventional subdivisions when the tract to be developed is possessed of significant natural constraints or prime agricultural soils.

To be sure, the Dolington Group vigorously argues that it is precisely the effect of the CM district regulations in reducing the permitted intensity of development of the Subject Property to which the challenge is addressed. It is clear from the Dolington Group's evidence, however, that the inability to achieve the maximum developmental potential under the CM district regulations with respect to the Subject Property is a

function primarily of the pervasive natural constraints with which the Property is burdened.[14] By the Dolington Group's evidence, the Subject Property could have been lawfully developed in February 1996 as a performance subdivision containing 168 single-family lots, including 35 lots of 10,000 square feet, 67 lots of 6,500 square feet, and 66 lots of 4,500 square feet. This number, shown by plan to be achievable on the Subject Property and conceded to be less, by at least "another lot or two" than the actual maximum achievable on the site, is more than 95% of the maximum calculated without reference to any of the tract's natural constraints or agricultural soils.

The inability to achieve the maximum permitted developmental intensity by means of a conventional or cluster subdivision does not support a contrary conclusion. As we have indicated, it is the purpose of the CM district regulations to preferentially encourage the use of cluster development over conventional subdivision and performance subdivision over cluster with respect to tracts constrained by environmentally sensitive features or prime agricultural soils. The fact here demonstrated by the Dolington Group's proofs that 96% of the maximum permitted developmental intensity could be achieved on the Subject Property by use of a performance subdivision (notwithstanding the degree of its constraint by natural features), while conventional subdivision would permit the achievement of only about one-third of the permitted developmental intensity[15], establishes only that the regulations are functioning as they were intended: providing to the developer of this extremely constrained tract containing substantial areas of prime agricultural soils, very strong encouragement for the use of performance subdivision and, thereby, for the preservation of the agricultural soils and of significant areas of open space. The Dolington Group failed to rebut the presumption of legality applicable to the CM district regulations and we affirm the decision of the courts below to this effect.

The Order of the Commonwealth Court is affirmed.

14. Of course, environmentally sensitive areas of a tract can be a burden or a benefit depending on the plans for the property's use.

15. Eighty-eight dwelling units permitted but only 33 units achieved in the conventional subdivision plan admitted as Exhibit A–33.

Justice NIGRO files a concurring opinion.

Justice EAKIN files a concurring opinion.

Justice NEWMAN concurs in the result.

## CONCURRING OPINION

Justice NIGRO.

As there was evidence presented before the Zoning Hearing Board ("ZHB") regarding the characteristics and population growth of each of the four townships included in the joint zoning ordinance ("JZO") as well as evidence of the previous and projected population growth in all of the townships as a whole, I believe that the record is sufficient in this case to determine whether we must look at Upper Makefield Township alone or at all of the townships in the JZO together to determine whether Upper Makefield Township is in the path of growth. *See* ZHB Decision, 11/27/00, Fact Finding 33, 95, 96, 113–14, 157 (findings regarding Newtown Borough and Newtown Township); 115, 118–19, 144 (findings regarding Upper Makefield and Wrightstown Townships); 136–37, 139, 156 (findings regarding growth figures of all four townships). Nevertheless, I agree with the majority that we need not decide that issue today because the evidence also established that the JZO did not create an exclusionary result in all of the townships or in the CM District in Upper Makefield Township.

## CONCURRING OPINION

Justice EAKIN.

Allowance of appeal was granted to determine the application of *Surrick v. Zoning Hearing Board of the Township of Upper Providence,* 476 Pa. 182, 382 A.2d 105 (1977), to the validity of a multi-municipal zoning ordinance. There being insufficient facts of record to do so, the Majority saves the issue for another day, making the lengthy discussion on this issue merely advisory in nature. As such, I would affirm the Commonwealth Court without opinion.